# IN THE COURT OF APPEALS OF IOWA

No. 22-0739
Filed July 20, 2022

**IN THE INTEREST OF A.O.L. and J.O.B.,**
**Minor Children,**

**C.O.-M., Mother,**
    Appellant,

**J.B., Father of J.O.B.,**
    Appellant,

**T.L., Father of A.O.L.,**
    Appellant.
_____

Appeal from the Iowa District Court for Jones County, Joan M. Black, District Associate Judge.

A mother and two fathers appeal the juvenile court's order terminating their parental rights. **AFFIRMED ON ALL THREE APPEALS**.

Andrew R. Wiezorek of Jacobsen, Johnson & Wiezorek, P.L.C., Cedar Rapids, for appellant mother.

Robert W. Davison, Cedar Rapids, for appellant father J.B.

Phillip D. Seidl of Seidl & Seidl, P.L.C., Cedar Rapids, for appellant father T.L.

Thomas J. Miller, Attorney General, and Kathryn K. Lang, Assistant Attorney General, for appellee State.

Deborah M. Skelton, Walford, attorney and guardian ad litem for minor children.

Considered by Vaitheswaran, P.J., and Tabor and Badding, JJ.

**TABOR, Judge.**

Three-year-old A.L. and her one-year-old sister, J.B., both have special needs. The juvenile court terminated the parental rights of their mother, Candace; A.L.'s father, Tony; and J.B.'s father, Judson. All three parents separately appeal. After reviewing the record anew, we reach the same conclusions as the juvenile court—the parents have not exhibited the necessary skills or resolve to manage A.L.'s developmental delays or J.B.'s feeding issues. We thus affirm the termination order.[1]

## I.    Facts and Prior Proceedings

Acting on a report of methamphetamine use in August 2020, the Iowa Department of Human Services (DHS) investigated Candace for failing to properly supervise A.L. Inside the family's home, the child protective worker noticed a pipe near the toddler. Candace shoved the pipe under a couch cushion, denying it was drug paraphernalia. But Candace eventually tested positive for methamphetamine and amphetamines. A.L. could not be placed with Tony, who was incarcerated in Illinois. So the court approved the DHS request to remove the child from parental care.[2] For three months after A.L.'s removal, Candace refused services, including drug testing and evaluations for substance abuse and mental health.

Meanwhile, A.L. went to live with her paternal grandparents, who worked with the child on her significant developmental and speech delays. They

---

[1] We review termination orders de novo. *In re M.D.*, 921 N.W.2d 229, 232 (Iowa 2018). We give weight to the juvenile court's fact findings, but they do not bind us. *Id.* The State must prove its case by clear and convincing evidence. *In re L.B.*, 970 N.W.2d 311, 313 (Iowa 2022).

[2] This removal was not Candace's first brush with the DHS. She received services in 2007, and the court terminated her rights to another child in 2012.

suspected the delays stemmed from neglect by Candace. Then in November 2020, Tony returned home from prison, staying in a camper on his parent's property. That arrangement allowed him to participate nightly in A.L.'s bedtime routine. Tony also secured full-time employment, working six days a week for an agricultural tiling company. The court adjudicated A.L. as a child in need of assistance (CINA) in December 2020.

A few months after the DHS removed A.L., J.B. was born prematurely. Feeding issues were among the complications from her premature birth. Candace had a difficult time following J.B.'s strict feeding method and schedule. So nine days after her birth, in January 2021, that child too was removed from Candace's care. The court adjudicated J.B. as a CINA in February 2021.

Candace identified the baby's father as Judson, but he declined to participate in services until a paternity test confirmed his status. That confirmation occurred in April 2021. Yet he did not start participating in visits until June. Even then Judson was a passive participant, never feeding the baby, changing her, or tending to her other needs. Service providers reported that he relied on Candace to do the hands-on parenting.

Both girls experienced a change in placements during their CINA cases. As for A.L., her grandmother's health concerns required a move in May 2021 to the home of her paternal uncle and aunt, who lived about seventy miles away. That distance made it harder for Tony to have regular contact with A.L. Candance remained more consistent in her visitations. But it is the aunt and uncle who made sure that A.L. attended her speech and occupational therapy at the University of Iowa Hospitals and Clinics. As for J.B., she moved from one family foster home to

another in August 2021. The second foster mother had an easier time communicating with Candace about J.B.'s needs. Also to the good, Candace has consistently tested negative for controlled substances since January 2021.

But the DHS remained concerned about Candace's ability to address the special needs of both children. For example, throughout the case, service providers were concerned Candace was not following the protocol for J.B.'s feedings. The child needed to be fed no more than two ounces at a time while placed on her side. They were concerned when Candace failed to respond to their prompts regarding the feeding protocol. And in December 2021, service providers reported that during visits she fed the children age-inappropriate foods and was unreceptive to correction. Eventually, the court made the decision that J.B. would not be fed during her visits with Candace. And the fathers were even less engaged. The guardian ad litem (GAL) believed that both fathers loved their children and enjoyed spending time with them. That said, the GAL reported that the fathers also "appear to lack motivation to really dig in and learn how to parent their girls."

In January 2022, the State petitioned to terminate the parental rights of the mother and both fathers. After a March 2022 hearing, the court granted that petition. All three parents separately appeal.

## II.      Analysis

Our termination reviews generally follow a three-step process. *In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010). First, we look for proof of a termination ground. Iowa Code § 232.116(1) (2022). Second, we consider the children's best interests.

*Id.* § 232.116(2). And third, we examine any factors weighing against termination. *Id.* § 232.116(3).

### A. Candace's Appeal

The mother shoehorns all three steps into a single issue, frustrating our efforts to sort out her claims. For instance, on statutory grounds, she alleges the court erred in terminating her rights under Iowa Code section 232.116(1), paragraphs (g) and (h). But she does not specify what elements the State failed to prove. Even in the abbreviated briefing that is allowed in these expedited appeals, *see* Iowa Rs. App. P. 6.201(1)(*d*), 6.1401–Form 5, Candace's position is not sufficiently formulated to facilitate our review on the first step. *See In re M.G.*, No. 11-0340, 2011 WL 2090045, at *4 (Iowa Ct. App. May 25, 2011).

Turning to the second step, Candace argues termination was not in the children's best interests because they were not "suffering adverse effects" while she continued to comply with the case-plan requirements. She asserts that she was a "hands-on parent," had addressed her substance-abuse needs, completed a mental-health evaluation, and had housing.[3]

True, the mother deserves high praise for consistently testing negative for controlled substances. But in assessing best interests, we consider the children's safety, the best placement for furthering their long-term nurturing and growth, as well as their physical, mental, and emotional condition and needs. *See* Iowa Code

---

[3] We question the stability of the mother's housing. She lived with Judson during the CINA cases. As the DHS worker noted, if Judson didn't want her there, she would be without a place to stay. The worker observed: "She has been very codependent on either Tony or Judson during the entirety of the case, and if neither of them are able to be a support, then how is she going to maintain her needs as well as her kids' needs."

§ 232.116(2); *see also In re P.L.*, 778 N.W.2d 33, 37 (Iowa 2010). Security and the need for a permanent home mark the "defining elements" of children's best interests. *In re J.E.*, 723 N.W.2d 793, 802 (Iowa 2006) (Cady, J., concurring specially). On this record, the critical term is "needs." Both girls have needs that Candace is unable to meet. And we reject Candace's assertion that the children are not suffering adverse effects from the uncertainty of their future. A.L., especially, is emotionally unstable and "really struggles with transitions which can cause some . . . meltdowns." The children's best interests are served by terminating Candace's parental rights.

Next, Candace argues that section 232.116(3)(c) applies here. That provision allows a court to preserve parental rights if "[t]here is clear and convincing evidence that the termination would be detrimental to the child[ren] at the time due to the closeness of the parent-child relationship." Proving that exception was Candace's burden. *See In re A.S.*, 906 N.W.2d 467, 476 (Iowa 2018). To carry her burden, she points to her bond with the children.

Indeed, the DHS caseworker testified "they have a good relationship with their mom and visits go well." But the worker continued, "[O]utside of that, I think stability and their needs outweigh that bond at this time." We agree with that assessment. In considering this factor, we focus on whether the children will be "disadvantaged by termination" and whether that disadvantage outweighs the parent's inability to meet their needs. *D.W.*, 791 N.W.2d at 709. While severing the relationship with their mother may be hard on the girls, we see that disadvantage as less weighty than concern about her ability to address their special needs.

Finally, Candace contends she should be allowed six months more to achieve reunification. A court may, at its discretion, defer permanency if it can "enumerate the specific factors, conditions, or expected behavioral changes which comprise the basis for the determination that the need for removal" of the children from their home will no longer exist after the six-month reprieve. Iowa Code § 232.104(2)(b); *see also In re A.M.*, 843 N.W.2d 100, 113 (Iowa 2014). Deferring permanency would not be a good option for these children. Candace had eighteen months to reunite with A.L. and fifteen months to regain custody of J.B. She hasn't been able to gain the necessary parenting skills in that time, and it is unlikely she could do so with a deferral of permanency.

In the end, severing legal ties with the mother will enable these children to secure the help they need to grow and thrive.

**B. Tony's Appeal**

Tony contends the juvenile court erred in terminating his rights under Iowa Code section 232.116(1)(h). But like Candace, he does not point to which element he is contesting. That failure constitutes waiver of the issue on appeal. *See In re C.B.*, 611 N.W.2d 489, 492 (Iowa 2000) ("A broad, all encompassing argument is insufficient to identify error in cases of de novo review.").

Next, Tony argues termination of his parental rights was not in A.L.'s best interests. *See* Iowa Code § 232.116(2). He touts their strong bond and urges that severance of that bond "is extremely detrimental to the child's future well-being." *See* Iowa Code § 232.116(3)(c). No question, Tony developed a good relationship with his daughter. His mother testified that when A.L. was younger, Tony would

change her diapers and "help to get her food." But the grandmother offered brutal candor in estimating her son's ability to transition to being a full-time parent:

> Tony would make a good father, but right now he could not. He could not sustain her in the way that she is right now with the doctors that she goes to, with all the people that have been helping her, he just can't do that. There is no way.

We credit the grandmother's testimony on the child's best interests.

Although Tony does not use the term "reasonable efforts," he argues that the DHS transfer of A.L. to the home of her uncle and aunt was "essentially a forced estrangement" given how far away they lived and his "grueling work schedule." *See In re L.M.*, 904 N.W.2d 835, 839 (Iowa 2017) (describing reasonable efforts concept as including visitation arrangement designed to facilitate reunification while protecting child from harm). Then in the next paragraph he argues that her placement with relatives "provides the basis for the exception codified under Iowa Code section 232.116(3)(a)."

To untangle those threads, we note that the relative placement provided A.L. with a stable environment after her grandmother's health started failing. A.L. has assimilated into the new home, where she has four cousins to make her feel welcome. The DHS continued to offer Tony visitation with A.L. at his brother's house, but Tony was inconsistent in attending. As for the application of section 232.116(3)(a), Tony has not established that A.L. was in the "legal custody" of a relative. *See In re A.B.*, 956 N.W.2d 162, 170 (Iowa 2021) (noting DHS retained legal custody).

Finally, Tony contends he could have achieved reunification if given another sixty to ninety days. We don't see support for that contention in the record. Indeed,

the aunt testified that Tony "knew he could not have [A.L.] full-time" considering "all of her therapies and multiple appointments and concerns with his job."

Finding no merit to Tony's arguments, we affirm the termination of his parental rights to A.L.

### C. Judson's Appeal

Judson argues the juvenile court erred in terminating his rights under Iowa Code section 232.116(1)(h).[4] He challenges only the fourth element, asserting J.B. could be safely returned to his care "with some additional parenting instruction." With similar hedging, Judson adds his home "was available and would have been a more than adequate placement."

From our review of the record, we find the State presented clear and convincing evidence that J.B. could not be safely placed in Judson's care as of March 2022. *L.M.*, 904 N.W.2d at 839 (defining "present time" as time of termination hearing). Judson never progressed beyond semi-supervised visits. The social worker testified that Judson never had a solo visit with J.B. Candace was always there. And at those visits, he was not "interactive" with J.B. and did not demonstrate his ability to meet his young daughter's needs. In fact, service providers reported that Judson sometimes slept during the visits. Termination was proper under paragraph (h).

---

[4] Under Iowa Code section 232.116(1)(h), the court may terminate parental rights if: (1) "The child is three years of age or younger"; (2) has been adjudicated CINA under section 232.96; (3) "has been removed from the physical custody of the child's parents for at least six months of the last twelve months, or for the last six consecutive months and any trial period at home has been less than thirty days"; and (4) "clear and convincing evidence" exists "that the child cannot be returned" home "as provided in section 232.102 at the present time."

Judson next contends termination was not in J.B.'s best interests because of their bond. *See* Iowa Code §§ 232.116(2), (3)(c). He also mentions in passing that if "given a few more months" he could adequately care for J.B. The record does not support Judson's contention that his relationship with J.B. is so close that termination would be detrimental to her welfare. Or that a delay in permanency is appropriate. *See In re W.T.*, 967 N.W.2d 315, 324 (Iowa 2021) (noting father had several months to form close relationship with his child and "simply neglected to do so"). Finding no merit to Judson's arguments, we affirm the termination of his parental rights to J.B.

In sum, these children have special needs that cannot be met by their biological parents. Thus we find termination of parental rights offers the best chance of providing these children with a stable and healthy future.

**AFFIRMED ON ALL THREE APPEALS.**